**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

MARY KAY SCALERA,

                      Plaintiff,

      - against -

ELECTROGRAPH SYSTEMS, INC., KATHY
KOZIOL, ROSE ANN GORDON, and ALAN
SMITH,

                    Defendants.

------------------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**

CV 08-50 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    P<small>RELIMINARY</small> S<small>TATEMENT</small>

     Plaintiff Mary Kay Scalera ("Scalera") brings this disability discrimination action against

Defendants Electrograph Systems, Inc. ("Electrograph"), Kathy Koziol ("Koziol"), Rose Ann

Gordon ("Gordon"), and Alan Smith ("Smith") (collectively, "Defendants") for violations of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and the New York  Human

Rights Law ("NYHRL"), N.Y. Exec. Law § 290, *et seq.*  Scalera specifically alleges that

Defendants failed to reasonably accommodate her disability when they failed to install (1) a

higher toilet seat in the women's restroom; and (2) a hand rail at the side entrance of

Electrograph's Hauppauge office building.

     Defendants now move for summary judgment on four separate grounds.  For the

foregoing reasons, Defendants' motion for summary judgment is DENIED.

## II.   BACKGROUND

The following facts are drawn from the parties' Rule 56.1 Statements and are construed in the light most favorable to the non-moving party. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005). Unless otherwise noted, the following facts are not in dispute.

### A.   Parties

Defendant Electrograph was a New York Corporation which employed approximately 200 employees nationwide. Defs.' 56.1 Stmt. ¶¶ 3-4. However, Electrograph liquidated its assets and no longer functions as a viable enterprise. *Id.* ¶ 6. During all relevant time periods, Defendant Smith was the CEO of Electrograph, Defendant Gordon was the Director of Human Resources, and Defendant Koziol was the Director of Operations. *Id.* ¶¶ 7-8, 12. The Planitiff was employed by Electrograph as a Systems Programmer Analyst at its Hauppauge office from September 16, 2005, until October 11, 2006. *Id.* ¶¶ 1-2. Scalera suffers from a genetic disorder called Pompe Disease which severely impairs her ability to walk.[1] *Id.* ¶¶ 16-17. While employed at Electrograph, Plaintiff used a cane to assist with her walking. *Id.* ¶ 17. There is no dispute that management and other employees of Electrograph were aware of Plaintiff's limited mobility. *Id.* ¶ 19.

### B.   Accommodations for Scalera

When Plaintiff was offered the job as a software programmer, she was provided with the opportunity to purchase a chair of her choice. This chair was delivered to Plaintiff's desk prior to her first day of employment. *Id.* ¶¶ 20-21. Scalera was also permitted to enter and exit

---

[1]   Plaintiff was initially diagnosed with muscular dystrophy. That diagnosis was amended to Pompe Disease in January 2008.

though the side entrance of the building since that path minimized the distance she had to walk between her car and cubicle. *Id.* ¶¶ 22, 27. Plaintiff utilized the side entrance every day she was employed by Electrograph. *Id.* ¶ 23. Although management advised all employees sometime in October 2005 that they were not permitted to enter or exit the building through the side entrance, Plaintiff requested and received permission from her supervisor, Joe Koos, to continue using it. *Id.* ¶ 24. Although not asked personally by Scalera, Defendant Gordon as HR Director learned of Plaintiff's request to use the side entrance and approved it as a reasonable accommodation. *Id.* ¶ 26. Scalera frequently received manual assistance from Electrograph employees, including entering and exiting the building. *Id.* ¶¶ 36-37.

Scalera also utilized the parking spot closest to the side entrance of the building. *Id.* ¶ 28. Defendants claim that Plaintiff requested, and was granted, as a reasonable accommodation, the right to use this particular parking spot. *Id.* ¶ 29. Plaintiff denies this assertion, however, and states that she neither requested the right to use this particular spot nor spoke to anyone at Electrograph about it. Pl.'s 56.1 Stmt. ¶ 28.

Sometime in December 2005, Defendant Koziol had a conversation with Plaintiff and offered to relocate Plaintiff's cubicle to one that was closer to the ladies room.[2] Defs.' 56.1 Stmt. ¶ 31. This offer was declined by Scalera. *Id.* Koziol also offered Plaintiff the use of the "executive bathroom" since it was closer to Plaintiff's cubicle. *Id.* ¶ 32. Koziol initiated a conversation with Gordon and sent an e-mail to Smith in order to secure permission for Plaintiff to use the executive bathroom. *Id.* ¶ 34. Smith agreed to the request. *Id.* ¶ 35. While Scalera admits that Koziol offered her the opportunity to use the "executive bathroom," Plaintiff

---

[2] This conversation occurred two months prior to the Hauppauge office being renovated, which took place in February 2006. Defs.' 56.1 Stmt. ¶ 30.

maintains that she specifically told Koziol that this bathroom would not be an accommodation.[3]
Pl.'s 56.1 Stmt. ¶¶ 32-33.

### C.     Requested Accommodations

During her employment, Plaintiff claims that she requested two accommodations from
Defendants: (1) a higher toilet seat in the women's room; and (2) a hand rail for the side entrance
of the Electrograph building.  Pl.'s 56.1 Stmt. ¶ 39.  Plaintiff contends that on two separate
occasions in or around December 2005, she made in-person requests to Koziol for a higher toilet
seat.  *Id.* ¶¶ 39-40.  Koziol denies that Plaintiff ever asked her for higher seating in the bathroom.
Defs.' 56.1 Stmt. ¶ 33.  Other than Koziol, Plaintiff does not allege that she discussed the height
of the toilet seats with anyone else at Electrograph.  Pl.'s 56.1 Stmt. ¶ 41.  Scalera also claims
that she requested that a hand rail be installed by the steps at the side entrance sometime in
November 2005.  *Id.* ¶ 43.  According to Plaintiff, in addition to in-person requests for the
installation of a railing, she also e-mailed and called Defendant Gordon about the requested
accommodation.  *Id.*  Defendant Gordon denies ever being asked about the railing.  Defs.' 56.1
Stmt. ¶ 45.

### D.     The Accident

On July 13, 2006, while exiting the building through the side entrance, Plaintiff fell.
Defs.' 56.1 Stmt. ¶ 46.  Subsequent to the fall, Plaintiff requested and was granted non-FMLA
leave for 12 weeks.  *Id.* ¶ 48.  At the end of the 12 weeks, and in accordance with company
policy, Electrograph terminated Plaintiff's employment.  *Id.* ¶ 49.  On account of her injuries,
Plaintiff has been awarded Workers' Compensation.  *Id.* ¶ 50.  Plaintiff also receives disability

---

3       Scalera asserts that she specifically told Koziol that the "executive bathroom" would not
be an accommodation because the toilet was the same height as those in the women's restroom
and the "executive bathroom" did not contain a hand bar.  Pl.'s 56.1 Stmt. ¶ 32.

payments from Social Security and long-term disability payments from two insurance companies. *Id.* ¶¶ 51-52.

## III. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure dictates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir. 2007); *Woodman*, 411 F.3d at 75.

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y.C Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of

an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *1 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted). However, if "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir. 1997) (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)).

## IV.   DISCUSSION

In this case, Scalera alleges that the Defendants failed to make reasonable accommodations for her disability when they failed to provide higher seating for a toilet in the women's restroom and failed to install a hand rail at the side entrance. For purposes of this motion, Defendants make the following concessions: (1) Plaintiff is disabled under the ADA; (2) Electrograph was Plaintiff's employer under the ADA and NYHRL since it employed more than 15 people; (3) Electrograph recognized Plaintiff's disability, which it understood to be difficulty with walking; and (4) installing raised seating in the bathroom or a hand rail would not have posed an undue financial hardship on Electrograph.

Notwithstanding these concessions, Defendants contend that ADA liability is inappropriate because: (1) Plaintiff has not met her prima facie burden since she has provided no evidence that Defendants' alleged failures to accommodate were motivated by Plaintiff's disability;[4] (2) Defendants met their burden to accommodate the Plaintiff by engaging in the

---

4       Reasonable accommodation claims under the NYHRL are governed by the same legal standards as the federal ADA claims. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006); *Burton v. Metro. Transp. Auth.*, 244 F. Supp. 2d 252, 258 (S.D.N.Y. 2003). As such, the NYHRL claim survives or fails on the same basis as the ADA claim.

interactive process called for under the statute and providing Plaintiff with five other reasonable accommodations that were necessary for her to perform her job;[5] (3) there is no individual liability under the NYHRL for Defendants Smith, Gordon or Koziol; and (4) Plaintiff, who has already been compensated under Workers' Compensation for her injury, is abusing the judicial process in order to circumvent the exclusive remedy of Workers' Compensation since her claim is actually a tort action disguised as an ADA claim. Each of these arguments is addressed below.

### A.    Prima Facie Case

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[6] In addition to other forms of discrimination – such as disparate treatment and disparate impact – the term "discriminate" also includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an

---

[5]    In this section of their brief, Defendants also argue that they were not required to extend Plaintiff's leave of absence indefinitely, and acted reasonably when terminating her employment after 12 weeks of non-FMLA leave. Apparently, Defendants believe that Plaintiff has alleged, in the Second Amended Complaint, that she was terminated on account of discriminatory treatment. However, the Second Amended Complaint does not contain such an allegation. As such, the Court finds it unnecessary to address these arguments.

[6]    Because the events giving rise to Plaintiff's claims occurred prior to January 1, 2009 (the effective date of the ADA Amendments Act of 2008), the older version of Section 12112 applies. *See Wega v. Ctr. for Disability Rights, Inc.*, 395 F. App'x. 782, 784 n.1 (2d Cir. 2010) ("[T]here is no indication that Congress intended the ADA Amendments to have retroactive effect."). The current version of the statute states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Court notes that under either version of the statute, today's findings would apply equally.

undue hardship on the operation of the business of such covered
entity.

*Id.* § 12112(b)(5)(A). In reasonable accommodation cases, such as the present action, "the plaintiff's burden 'requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with [or without] reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Graves*, 457 F.3d at 184 (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)); *accord Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995). While Defendants are correct that the reasonable accommodation standard is not one of strict liability, once Plaintiff puts forth a prima facie case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997); *E.E.O.C. v. Yellow Freight Sys. Inc.*, No. 98 CIV. 2270, 2002 WL 31011859, at *11 (S.D.N.Y. Sept. 9, 2002); *see also DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004).

### 1. *Motive*

Based on the parties' submissions, there appears to be some confusion as to what is necessary to establish a prima facie disability discrimination claim where the claim is based strictly on a failure to accommodate. Defendants claim that Scalera must also demonstrate – as an integral part of her prima facie case – that her disability was a motivating factor in the employer's decision not to provide a reasonable accommodation. To require Scalera to satisfy this additional element given the circumstances of this case, however, would be a misapplication of the law.

In support of this additional element, Defendants rely heavily on the Second Circuit's decision in *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100 (2d Cir. 2001).[7] In *Parker*, the plaintiff suffered a workplace injury that led him to take an extended medical leave. 260 F.3d at 104. After plaintiff's guaranteed leave expired, he was terminated. *Id.* The plaintiff in *Parker* alleged that he was fired because his employer failed to provide the reasonable accommodation he needed to return to work, which was a modified work schedule. *Id.* Appealing a jury verdict for the defense which found that plaintiff's disability was not a motivating factor in his discharge, the plaintiff argued that no such motivating requirement was necessary to find liability where the alleged discrimination was defendants' failure to provide a reasonable accommodation. *Id.* at 107.

The Second Circuit first made clear in *Parker* that "[i]n employment discrimination cases *that do not turn on the employer's provision of a reasonable accommodation*, the plaintiff's ultimate burden is always to show that the protected characteristic in question played a motivating role in, or contributed to, the employer's decision." *Id.* (internal quotation marks omitted) (emphasis added). Here, Scalera's case *does* turn on the Defendant employer's provision of a reasonable accommodation, leading to a different analysis.

The court in *Parker* also noted that a plaintiff must prove a causal connection between an employer's failure to provide a reasonable accommodation and his discharge. *Id.* However, what the Defendants overlook in *Parker* – and what the Second Circuit went on to clarify – is that in situations where a plaintiff was unable to return to work because the defendant did not

---

7      Defendants also rely on *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) as support for the proposition that in employment discrimination claims, a plaintiff must present evidence of "circumstances that permit an inference of discrimination on an impermissible basis." Reliance on *Goenaga*, however, is misplaced as that case involved discrimination claims brought under Title VII.

provide a reasonable accommodation and the defendant fired the plaintiff because he failed to

return to work, "[s]uch a causal connection between disability and discharge satisfies the

'motivating factor' requirement." *Id.* at 108. Therefore, the court held that *"it remains essential*

*to a finding of discrimination that plaintiff's disability, or the lack of accommodation to that*

*disability, played a substantial role that made a difference to his employer's action." Id.* (internal

quotation marks omitted).

Comparing the *Parker* case to the current action shows how the analysis and holdings in

*Parker* are not controlling here. Unlike *Parker*, Plaintiff's disability discrimination case turns

solely on the employer's failure to provide a reasonable accommodation. While Scalera was

ultimately terminated, she does not allege in the Second Amended Complaint that she was fired

because Electrograph failed to provide a reasonable accommodation that would have allowed her

to return to work.[8] Instead, Scalera maintains that she was not provided with reasonable

accommodations, which led to a workplace injury, which ultimately led to her termination.

Since there is no discriminatory discharge or adverse employment element to Scalera's claim,

there is no burden on Plaintiff to show that her disability played any motivating role in

Electrograph's failure to provide the requested accommodation. *See Price v. City of N.Y.*, 797 F.

Supp. 2d 219, 233 (E.D.N.Y. 2011) (concluding that the element of "causation, i.e. that

---

[8]    The Court is compelled to address briefly Plaintiff's contention that she is not required to
show that Defendants acted with discriminatory animus, but rather, "is only required to show a
causal nexus between Defendants' failure to provide her reasonable accommodation and the
adverse employment action and/or her damages." *See* Pl.'s Mem. of Law in Opp'n to Defs.'
Mot. for Summ. J. at 9. As previously indicated, the Second Amended Complaint does not
contain any claims of adverse employment action against the Plaintiff because of her disability.
It is clear to the Court that the Plaintiff is attempting to allege as damages the fall she
experienced on Electrograph's premises and the events that occurred subsequent to her injury,
which she labels as "adverse employment actions." The Court offers no view on the issue of
damages since it is not part of the pending motion.

Defendants took an adverse employment action against Plaintiff because of his disability" is not required since the complaint "does not state facts that support a disability discrimination claim on a basis other than the alleged failure to provide reasonable accommodation").

The lack of a plaintiff's need to show discriminatory intent in reasonable accommodation cases was also noted by the First Circuit in the case *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). In *Higgins*, the First Circuit observed:

> Unlike other enumerated constructions of "discriminate," [the reasonable accommodation] construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability"- the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability - and no proof of a particularized discriminatory animus is exigible. *See Bultemeyer v. Fort Wayne Community Schs*., 100 F.3d 1281, 1283-84 (7th Cir. 1996). Hence, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, *no matter what its intent*, unless it can show that the proposed accommodations would create undue hardship for its business. 42 U.S.C. § 12112(b)(5)(A)

194 F.3d at 264 (emphasis added); *see also Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007) ("[A] failure to make reasonable accommodation claim requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.'") (quoting 42 U.S.C. § 121112(b)(5)(A)).

Here, liability is premised on the failure of Defendants to provide Plaintiff two alleged reasonable accommodations – not pursuant to any alleged adverse employment action taken against the Plaintiff because of a requested accommodation. Therefore, Defendants' argument

that Scalera must show that her disability was a motivating factor in the employer's decision not to provide a reasonable accommodation as part of her prima facie case is unavailing.

Turning now to the actual elements of Plaintiff's prima facie case, Defendants readily concede that the first two elements are met. Therefore, Scalera must, at a minimum, come forward with evidence that can lead a reasonable jury to conclude that the Plaintiff has met her burden in showing that she can perform the essential functions of the position with or without reasonable accommodation and that the employer has refused to make a reasonable accommodation.

### 2.    Essential Functions of the Job

A plaintiff who brings an action under the ADA for failure to make reasonable accommodations must establish that he or she can perform the essential functions of the job, either unaided or with the assistance of a reasonable accommodation. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n); *see also Lyons,* 68 F.3d at 1515 (listing third requirement for plaintiff's prima facie case as "with or without reasonable accommodation, she could perform the essential functions of the job"). Electrograph does not argue, and the record is lacking any evidence, that Scalera was unable to perform the fundamental job duties of a Systems Programmer Analyst.

Instead, Defendants contend that the Plaintiff did not need the requested accommodations to do her job because neither requested accommodation had anything to do with her job duties.[9] In essence, Defendants are claiming that they are not under an obligation to provide requested accommodations that an employee does not need to accomplish the essential functions of his or her job. Not only does the Court conclude that the requested accommodations go to the essential

---

[9]    The Court will address Defendants' other "needs-based" arguments *infra*.

functions of Plaintiff's job, but the Court further finds that Defendants' reading of the ADA is too narrow in scope.

As an initial matter, courts have recognized that the essential functions of a job are much broader than those duties that are specifically tied to the particular position the employee is hired to fulfill. Indeed, one such essential function of an employee's job is showing up for work.[10] *See Lyons*, 68 F.3d at 1516 ("It is clear that an essential aspect of many jobs is the ability to appear at work regularly and on time"); *Davis*, 1997 WL 655935, at *16 ("It is axiomatic that an employee who cannot show up for work cannot perform an 'essential function' of her job."). In addition, at least one court has concluded that "being able to use the restroom at work can allow an employee to perform the essential functions of the job." *Lerman v. Xentel, Inc.*, No. 08-62077-CIV, 2009 WL 4632881, at *5 (S.D. Fla. Dec. 2, 2009).

---

[10] Defendants maintain that the ADA does not require an employer to accommodate an employee who cannot get to work. The cases cited by Defendants which support this position involved a plaintiff who was unable to arrive at work in the first instance. S*ee Gronne v. Apple Bank for Sav.*, No. 98-CV-6091, 2000 WL 298914, at *6 (E.D.N.Y. Feb. 14, 2000) (holding that the accommodation to pay half of the employee's transportation costs for an employee who had a disability preventing her from driving "went far beyond the requirements of the ADA"); *Davis v. Bowes*, No. 95 Civ. 4765, 1997 WL 655935, at *16 (concluding that employer did not have to make a reasonable accommodation to an employee who was not present at the job for a period of six months). The Court first notes that the Second Circuit has determined that "there is nothing inherently unreasonable . . . in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work." *Lyons*, 68 F.3d at 1517; *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 505 (3d Cir. 2010) ("[T]he ADA does not strictly limit the breadth of reasonable accommodations to address only those problems that an employee has in performing her work that arise once she arrives at the workplace."). In any event, the Court finds nothing in the record to suggest that Plaintiff did not, or was unable to, show up for work on time. Further, there is a difference between a disabled employee's inability to physically show up for work and a disabled employee's difficulty accessing the facility once she arrives at the workplace. At the very least, a reasonable jury could conclude that Scalera was able to perform the essential function of showing up to work with the requested accommodation of a hand rail at the side entrance.

It is worth spending a moment reviewing the facts and holding in *Lerman*. Although the holding is not binding, the Court nonetheless finds the reasoning persuasive. In *Lerman*, the plaintiff argued that being able to use the bathroom at work was essential to his job since he could not go home every time he needed to use the restroom. *Id.* at *4. Based on severe injuries to his back and spine, Lerman was forced to use a wheelchair. *Id.* at *1. During the training program for his new job as a telemarketer, Lerman needed to use the bathroom and when he went to do so, he was unable to access the toilet because he could not get his wheelchair close enough to do a slide-across transfer. *Id.* at *1 n.3. Nor could he get close enough to utilize the one grab bar in place beside the toilet. *Id.* Lerman stated that he similarly could not get to the sink because his knees would not fit under it while he was in the wheelchair. *Id.* Likewise, the one paper towel dispenser was at a height where he could not access it. When Lerman reported the difficulties, his manager purportedly recommended that he use the bathroom of neighboring businesses or that he contact the defendant's corporate offices. *Lerman*, 2009 WL 4632881, at *1. Lerman eventually went home to use the bathroom. *Id.* After contacting the corporate headquarters, Lerman said he was told that the bathroom was going to stay the same. *Id.* In denying defendant's motion for summary judgment, the court in *Lerman* found that:

> Plaintiff has presented evidence that he alerted his employer that he was unable to use the bathroom at the office due to his disability and that he could be accommodated if Defendant made the restroom accessible to him. . . .
>
> The Court finds that being able to use the restroom at work can allow an employee to perform the essential functions of the job. Here, it could be the essential function of being present at the job. Thus, genuine issue of material fact remain as to whether a "reasonable accommodation," which would have allowed Plaintiff to perform an essential job function was not provided, and summary judgment is inappropriate on this ground.

*Id.* at *4-5 (citations omitted).

14

In the instant case, Scalera testified at her deposition that based on her disability, she experienced great difficulty using a toilet unless it was at a raised height, approximately 18 inches from the ground. *See* Decl. of Timothy P. Coon, Ex. C (hereafter referred to as "Scalera Dep.") at 107-112; *see also* June 10, 2011 Decl. of Mary Kay Scalera ("Scalera Decl.") ¶ 7. According to the Plaintiff, the toilets in Electrograph's women's restroom were all standard height, approximately 12 inches tall. Whenever she used the toilets, Scalera stated that she experienced significant strain and pain. Scalera Dep. at 109, 119-20; Scalera Decl. ¶ 8. When Plaintiff first started at Electrograph, there was a steel hand bar in one of the stalls in the women's restroom which she used to lower herself and then raise herself. Scalera Dep. at 114-15; Scalera Decl. ¶ 9. Plaintiff testified that she spoke with Defendant Koziol around December 2005 and explained she needed a higher toilet in the restroom. Scalera Dep. at 111; Scalera Decl. ¶ 11.

According to the Plaintiff, Koziol said the restroom was going to be renovated and would be made handicap compliant. Scalera Dep. at 112; Scalera Decl. ¶ 11. In that same conversation, Koziol advised the Plaintiff that she could use the executive bathroom. However, Plaintiff says she explained to Koziol that such an option would not work because the toilet in the bathroom was the same height as the women's restroom and there was no hand bar. Scalera Dep. at 112; Scalera Decl. ¶ 12. Plaintiff spoke to Koziol a second time about a raised toilet and Koziol confirmed that a higher toilet would be installed. Scalera Dep. at 116-17; Scalera Decl. ¶ 13. Scalera further stated that when the renovations were completed, all of the toilets were the same height as the old toilets and no handicap toilet had been installed. Scalera Decl. ¶ 15. Koziol confirmed during her deposition that none of the new toilets installed as part of the renovation were specifically for a handicapped person. *See* Decl. of Timothy P. Coon, Ex. E

15

(hereafter referred to as "Koziol Dep.") at 53. In addition, Scalera testified that the hand bar had been removed and was not replaced while she was still employed. Scalera Dep. at 116. As a result, the Plaintiff testified that she often tried to hold in the urge to go to the restroom, resulting in stomach cramps. Scalera Dep. at 108-109; Scalera Decl. ¶ 18. Koziol testified that Plaintiff told her during a conversation in December 2005 that she had "trained herself not to go to the bathroom." Koziol Dep. at 33.

Former Electrograph employee Carolyn Reutter, a computer programmer at Electrograph for ten years, has corroborated the Plaintiff's testimony that the toilets in both the executive bathroom and the women's restroom were all standard height, not raised. *See* June 6, 2011 Decl. of Carolyn Reutter ("Reutter Decl.") ¶ 10. After the renovation of the women's restroom, none of the toilets were higher, the restroom was not handicap accessible, and the hand bar had been removed. *Id.* ¶ 13. Paulette Johnston, another Electrograph employee until she retired in 2007, states that she spoke with the Plaintiff about the problem with the low toilet seats in the women's bathroom. *See* April 30, 2010 Decl. of Paulette Johnston ("Johnston Decl.") ¶¶ 7-9. In April 2007, the Plaintiff asked Johnston to take pictures of the stalls in the women's restroom. *Id.* ¶ 12. She did so. At that time, there was no railing or steel bar in any of the stalls. *Id.* ¶¶ 13-14. Ms. Johnston adds that there was no railing in the women's bathroom at the time of Plaintiff's fall outside the building. *Id.* ¶ 14.

Defendants maintain that prior to the restroom renovations in December 2005, Defendant Koziol had a conversation with the Plaintiff which Koziol offered to relocate Plaintiff's cubicle to a spot closer to the ladies room. Koziol says the Plaintiff declined because her cubicle was closer to the side door where she entered and exited the building. *See* Koziol Dep. at 33. Based on that conversation, Koziol asserts that on her own initiative, she offered Plaintiff use of the

executive bathroom because it was closer to her cubicle and she got permission from Defendants Gordon and Smith to do so. Koziol Dep. at 38-41, 50-51. Koziol denies that Plaintiff ever asked her for higher seating in the bathroom. *Id.* at 38-39. Taking all of this information into account, it is clear that a genuine issue of material fact remains as to whether a "reasonable accommodation" which would have allowed Plaintiff to perform an essential job function was not provided. This Court concurs with the findings in *Lerman* that being able to use the restroom at work can allow an employee to perform the essential functions of the job. In this instance, it could be the essential function of being present at the job. *See Lerman*, 2009 WL 4632881, at *5. Plaintiff says she requested a reasonable accommodation in the form of a raised toilet. Defendants say she did not. That determination should be made by the jury.

It is also the Court's view that Defendants' interpretation of the ADA is too narrow. As the Court will discuss *infra*, 29 C.F.R. § 1630.2(o)(1)(iii) "requires employers to make modifications and adjustments, not just to minimally permit disabled employees to do their job, but also to permit them to enjoy all of the 'benefits and privileges' of the job as would any other employee." *E.E.O.C. v. Life Techs. Corp.*, No. 09-2569, 2010 WL 4449365, at *4 (D. Md. Nov. 4, 2010). Similar to Defendants' argument here, the defendant in *Life Techs.* argued that the employee was able to perform all of the essential functions of his position without the requested accommodation. *Id.* at *2. Aside from dismissing that argument in light of 29 C.F.R. § 1630.2(o)(1)(iii), the court noted that defendant's understanding of what a reasonable accommodation entailed was inconsistent with other provisions of the ADA as well. *Id.* at *5 (concluding that implicit in the definition of a "qualified individual," codified at 42 U.S.C. § 12111(8), "is the expectation that some accommodations are provided to do more than just permit the qualified individual with a disability to perform the essential functions of the

position"); *id.* (finding that while 29 C.F.R. § 1630.9 "indicates that some reasonable

accommodations are for the purpose of enabling an individual to perform the essential functions

of a job, nothing in its language indicates that all reasonable accommodations must be for that

purpose"). Further support for the proposition that reasonable accommodations are not limited

to only essential job functions can be found elsewhere. *See Campbell v. Wal-Mart Stores, Inc.*,

272 F. Supp. 2d 1276, 1291 (N.D. Okla. 2003) ("Plaintiff's contention that the purpose of a

reasonable accommodation is not merely for the performance of job functions, but also to enable

employees to 'enjoy the privilege and benefits of employment' is well-taken."). Accordingly,

Defendants' argument would also fail on the basis that the requested accommodations did not

necessarily have to go to essential functions of the job, as long as Plaintiff could perform the

essential functions of her job, with or without accommodations.

### 3.    *Refusal to Make a Reasonable Accommodation*

The parties clearly dispute whether Plaintiff actually made the two requested

accommodations. However, it is not disputed that Electrograph did not install raised toilets or a

hand rail at the side entrance to the building, even if Plaintiff did make such requests. With

regard to this required element of "refusal" in establishing a prima facie case, however, there are

other factors for a court to consider. For instance, key to the determination of whether a plaintiff

has established this element is whether the requested accommodation, which the employer has

refused or otherwise failed to make, is reasonable.

Regarding the requirement that the requested accommodation be reasonable, a plaintiff

"bears only a burden of production." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138

(2d Cir. 1995) (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)). The Second Circuit

has made clear that this burden "is not a heavy one" and that "[i]t is enough for the plaintiff to

suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* The issue of whether an accommodation is reasonable is normally a question of fact, unsuited for a determination on summary judgment. *See Canales-Jacobs v. N.Y. State Office of Ct. Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) (citing *Borkowski*, 63 F.3d at 138).

The Court notes that significant guidance has been provided by the statutory and regulatory provisions of the ADA which helps define the term "reasonable accommodation" and sets forth a nonexclusive list of what may be considered to be reasonable accommodations. The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment . . . that enable an individual with a disability who is qualified to perform the essential functions of that position" as well as "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. §§ 1630.2(o)(1)(ii)-(iii). Therefore, a reasonable accommodation may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12111(9)(A); 29 C.F.R. § 1630.2(o)(2)(i).

Although the parties dispute whether Scalera ever requested higher seating in the women's restroom or that a hand rail be installed near the steps of the side entrance, a jury could reasonably credit the testimony of the Plaintiff and non-party employee Carolyn Reuter that such requests were made. Moreover, in light of what is considered to be a reasonable accommodation under the ADA, and Defendants' concession that installing raised seating in the women's restroom or a hand rail would not have posed an undue financial hardship, a rational jury could

find that the two requests for accommodation in this case, both of which go to making the Hauppauge office readily accessible to and usable by the disabled Plaintiff, were reasonable.

Defendants, however, maintain that Plaintiff did not *need* the requested accommodations. With regard to the hand rail at the side entrance, Defendants argue that Scalera was able to enter and exit the building through the side entrance with the use of her cane and the assistance from other Electrograph employees. Moreover, Defendants highlight the fact that Plaintiff could have entered or exited the building through the front entrance. As for the higher toilets, Defendants also assert that this was *not necessary* since Scalera had toilets in her house at the same height as those in the Electrograph bathroom.[11] While the Court acknowledges that there must be some sort of causal connection between the Plaintiff's disability and the requested accommodation, Defendants' position, is, again, too narrow.

To establish a prima facie case of discrimination for failure to make a reasonable accommodation, the Sixth Circuit explicitly lists as an element of the claim that the "accommodation was needed." *Benaugh v. Ohio Civil Rights Comm'n.*, 278 F. App'x. 501, 508 (6th Cir. 2008) (citing *DiCarlo*, 358 F.3d at 419). However, "needed" in this context meant that "a causal relationship existed between the disability and the request for accommodation." *Id.* Whether or not the requested accommodations were necessary, as Defendants seek to apply that term, is irrelevant to Plaintiff's prima facie case. All Plaintiff needs to show is that the requested accommodations were reasonable and connected to her disability. *See Borkowski*, 63 F.3d at 138; *Fink v. N.Y.C. Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995). Based on the record

---

11    The Court notes that this fact is disputed by the Plaintiff. Therefore, even if Defendants' argument was a valid one, the Court would not be in a position to grant summary judgment regarding the requested accommodation for higher toilets.

submitted, it is the Court's view that a reasonable jury could find in the affirmative on both issues.

Another consideration for the Court, which relates to the last element of Plaintiff's prima facie case, is Defendants' contention that Electrograph provided Plaintiff with five other reasonable accommodations.  The accommodations Defendants claim to have provided the Plaintiff are the following: (1) a chair of Plaintiff's choice; (2) the ability to enter and exit through the side entrance; (3) the parking spot closest to the side entrance; (4) use of the executive bathroom; and (5) physical assistance from employees entering and exiting the building.  While the ADA "does not require the employer to provide every accommodation a disabled employee may request," it does require that "the accommodation provided is reasonable." *D'Eredita v. ITT Corp.*, 370 F. App'x. 139, 141 (2d Cir. 2010) (quoting *Fink*, 53 F.3d at 567); *see also Querry v. Messar*, 14 F. Supp. 2d 437, 445 (S.D.N.Y. 1998) ("An employer need only offer 'a reasonable accommodation'; it need not provide the employee with the accommodation of her choice."); *but see Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 516 (N.D.N.Y. 2004) ("An employer's duty to make reasonable accommodations is a continuing one.").  If an accommodation other than the one requested is provided, that accommodation must sufficiently address the limitations of the disabled employee.  *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005).

Defendants maintain that the five accommodations provided to Plaintiff warrant summary judgment in their favor.  To support this contention, Defendants direct the Court's attention to *Trepka v. Bd. of Educ. of Cleveland*, 28 F. App'x. 455 (6th Cir. 2002).  In *Trepka*, the plaintiff disabled teacher requested that her classroom be moved closer to where she parked her car.  28 Fed. Appx. at 458.  Instead of providing the requested accommodation, the defendant offered

21

two other accommodations to the plaintiff: a cart to carry her materials; and the assistance of custodians to help move materials from her car. *Id.* Affirming the lower court's summary judgment in favor of the defendant, the court concluded that there was no genuine issue of material fact since the plaintiff did not offer any evidence regarding the adequacy of the alternatives offered. *Id.* at 460.

The facts of this case, however, clearly distinguish it from *Trepka*, where the uncontroverted record showed that Trepka received two alternative accommodations. Here, Plaintiff challenges each and every purported accommodation provided by the Defendants on one of two grounds – either such an accommodation was not provided or the provided accommodation was inadequate. First, Plaintiff disputes that the parking spot closest to the side entrance was provided to her by Electrograph as a reasonable accommodation. Scalera claims that nobody spoke to her about the use of this spot. Instead, Plaintiff maintains that she just tried to park as close as possible to the building. Scalera states that Electrograph did not have handicapped parking. Scalera Decl. ¶ 20. When asked at her deposition "Were there any designated handicapped parking spaces at Electrograph," Plaintiff responded "No." Scalera Dep. at 80. Defendants have produced no evidence to the contrary. Former employee Paulette Johnston adds some support for Plaintiff's position. In her sworn declaration, Johnston recalls a disabled customer complaining about the lack of handicapped parking. Johnston Decl. ¶ 16.

Citing *Trepka*, the Defendants maintain that they gave the Plaintiff physical assistance during her nine months as an Electrograph employee. *See* Defs.' Mem. at 9. Specifically, Defendants state that

> Virtually every day, as Plaintiff was entering or exiting the building, an Electrograph employee would manually assist her by, for example, holding open the side door, or carrying her purse for her. Defendant GORDON physically assisted Plaintiff.

Defs.' 56.1 Stmt. ¶ 37. According to Defendants, they offered Plaintiff "an alternative to the handrail" by providing Plaintiff personal assistance entering and exiting the building virtually every day. Defs.' Mem. at 13. Plaintiff admits that she received physical assistance from friends and colleagues at Electrograph, but notes that the individuals did so on their own volition or because she asked them for assistance. Scalera Dep. at 146-48; Scalera Decl. ¶ 29. Carolyn Reutter confirmed that she voluntarily helped the Plaintiff and that "Electrograph management did not instruct or ask me to assist Mary Kay. I chose to provide assistance to Mary Kay." Reutter Decl. ¶ 19.

Regarding the executive bathroom, Plaintiff does not dispute that she was permitted to use it. However, it is Plaintiff's position that the executive bathroom was not an accommodation at all because the toilets in that bathroom were the same height as those in the women's restroom. Finally, while Scalera does not dispute that she was provided a desk chair and the use of the side entrance to the building, she argues that these accommodations were not alternatives to the two unfulfilled requests for accommodations, since they did not address the same needs. *Cf. Gronne*, 2000 WL 298914, at *6 (E.D.N.Y. Feb. 14, 2000) (granting summary judgment where employer offered reasonable accommodation of paying half of plaintiff's transportation costs on those days she could not otherwise secure a ride to work and Plaintiff refused to accept anything other than a transfer back to her former branch office).

In light of these clearly disputed facts, and viewing such facts in a light most favorable to the Plaintiff, the Court finds that summary judgment is not appropriate on the question of whether the Defendants reasonably accommodated Plaintiff's disability with the five alleged accommodations provided. Such a determination is therefore left to the trier of fact.

## B.     Interactive Process

Defendants also argue that summary judgment is appropriate because Defendants engaged in the interactive process with Plaintiff and provided her with reasonable accommodations. As the Court has already addressed Electrograph's contention that it provided Scalera with reasonable accommodations, the Court briefly turns to the "interactive process" to which Defendants refer. The federal regulations implementing the ADA state the following:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3); *see also Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."). One circuit court has suggested that the "interactive process" can include actions such as

> meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome.

*Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3d Cir. 1999).

Defendants argue that the evidence illustrates their good faith effort to engage in the interactive process with the Plaintiff. Even accepting this statement as true, Defendants fail to show how simply engaging in the interactive process somehow shields Electrograph from liability and warrants summary judgment being granted in Defendants' favor.[12] Instead,

---

12      The Court notes that the opposite holds true as well. An employer's failure to engage in a sufficient interactive process does not allow a plaintiff to avoid summary judgment on its own

Defendants cite a Seventh Circuit case that looked to the actions of the parties after the record clearly indicated that the interactive process broke down. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Concluding that "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability," the court in *Beck* determined that when a breakdown occurs, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Id.*

Here, Defendants do not argue that the interactive process broke down in any way or that Plaintiff did not participate in good faith. Instead, Defendants merely highlight instances from the record which support the contention that they participated in the interactive process. Plaintiff, on the other hand, argues that there is evidence the Defendants did not properly engage in the interactive process. Counsel for the Defendants points to Rose Ann Gordon, Electrograph's HR Director, as the person in charge of determining what accommodations should be provided to employees. *See* Defs.' Mem. at 19. Gordon testified that she never spoke to the Plaintiff directly about accommodations the Plaintiff needed. Decl. of Timothy P. Coon, Ex. F (hereafter referred to as "Gordon Dep.") at 63. Plaintiff claims, however, that she spoke with Gordon and requested the installation of a railing at the side entrance. Scalera Dep. at 130-32. Scalera testified that she followed up with an e-mail to Gordon but never got a response and, after that, Gordon avoided her. *Id.* Scalera stated that when she spoke with Gordon again about the railing several months later, Gordon did not respond. *Id.* at 148-49. Based upon the totally conflicting versions of what occurred here, the question of whether Defendants engaged in the interactive process is again one left for a jury.

---

either. *See Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 443 (E.D.N.Y. 2009).

## C.     Individual Liability under NYHRL

Defendants also argue that Defendants Gordon, Smith and Koziol cannot be held individually liable under either Section 296(1) or 296(6) of the NYHRL. Section 296(1) states that it shall be an "unlawful discriminatory practice" for an "employer" to discriminate against an individual on the basis of their disability. *See* N.Y. Exec. Law. § 296(1)(a). In addition, Section 296(6) states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." *Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (quoting N.Y. Exec. Law. § 296(6)).

"The Second Circuit, interpreting the relevant decisions of the New York Court of Appeals, has held that individual civil liability is established under NYSHRL when any one of three conditions is met." *Messer v. Fahnestock & Co.*, No. 03-CV-4989, 2008 WL 4934608, at *9 (E.D.N.Y. Nov. 18, 2008). Under the direct liability provision of Section 296(1), a corporate supervisor or manager may be held liable if that person has: (1) any ownership interest in the employer; or (2) the power to do more than carry out personnel decisions made by others. *Johnston v. Carnegie Corp.*, No. 10 Civ. 1681, 2011 WL 1118662, at *5 (S.D.N.Y. Mar. 23, 2011) (citing *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 543-44, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (internal quotation marks omitted); *Messer*, 2008 WL 4934608, at *9 ("[A] plaintiff may proceed against an individual defendant under the direct liability provision of NYSHRL, § 296(1)(a), if the defendant either, first, has an ownership interest in the employer or, second, has the power to hire and fire the plaintiff."). Courts turn to the "economic realities" test in determining whether the individual defendant maintains powers that would open the door to individual liability under the second prong. *Dantuono v. Davis Vision, Inc.*, No. 07-CV-2234,

2009 WL 5196151, at *10 (E.D.N.Y. Dec. 29, 2009). Under the "economic realities" test, courts balance "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). Since this test is a "fact-intensive balancing inquiry," the determination of whether an individual can be held liable is typically not suited for summary judgment. *See Dantuono*, 2009 WL 5196151, at *9.

An individual can also be held liable under § 296(6) when he or she "actually participates in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *see also Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 425-26 (E.D.N.Y. 2008). While Defendants correctly point out that those cases involving Section 296(6) predominately contemplate scenarios in which the individual defendants commit affirmative acts of discrimination, liability can attach under circumstances where the individual contributed to the failure to make reasonable accommodations as well. *See Tully-Boone*, 588 F. Supp. 2d at 425-26 (analyzing liability under Section 296(6) as it pertains to those individuals who allegedly failed to provide reasonable accommodations to the plaintiff). Accordingly, Defendants' contention that the case law only extends Section 296(6) liability to instances where supervisors fail to stop sexual or verbal abuse that creates a hostile work environment is without merit.

### 1.     *Gordon*

Specifically addressing HR Director Gordon, Defendants maintain that she should not be individually liable under Section 296(1) since she had no pecuniary interest in Electrograph. Plaintiff counters that Gordon was part of Electrograph's management, and, based on testimony from Defendant Smith, there is evidence that she had an ownership interest. After reviewing Smith's testimony, the Court finds no evidence to support Plaintiff's position that Gordon had an ownership interest in Electrograph. Defendant Smith testified that "members of management" owned approximately 20 percent of Electrograph. Smith Dep. at 16-17. Lacking from his testimony and the record as a whole, however, is any evidence to support the statement that Defendant Gordon was one of those members of management who had an ownership interest. Failing to proffer any such evidence, the Court finds Plaintiff's argument to be without merit.[13]

Nevertheless, Gordon can still be considered an "employer" if she maintained the power to do more than carry out personnel decisions made by others. Defendants assert that Gordon did not have the authority to do more than carry out routine personnel decisions made by others. The Court notes that authority to hire and/or fire employees is but one of four elements for a court to consider under the "economic realities" test. *See Picinich*, 321 F. Supp. 2d at 518 ("[N]o single factor of this test is dispositive, as economic reality is based on all the circumstances.") (internal quotation marks omitted). Looking to all the elements under the economic realities test, the Court finds sufficient evidence in the record to support the conclusion that Gordon was an "employer" under Section 296(1).

---

13      Because the same holds true for Defendant Koziol, the Court will not address this argument further.

Gordon testified that her day-to-day responsibilities included overseeing her staff regarding such topics as recruitment, employee relations, compensation, education, training and safety. Gordon Dep. at 15. Although Gordon testified that Carol Dinow was responsible for hiring all new employees, Gordon was her direct supervisor. *Id.* at 34. Specifically on the topic of hiring the Plaintiff, Gordon conceded that she was "somewhat" involved in this decision and explained that Dinow conferred with her about Scalera and others. *Id*. at 49. Regarding terminations, Gordon stated that Dinow became involved after being trained by her. *Id.* at 35. However, Gordon acknowledged that the decision to terminate Scalera was hers. *Id.* at 124. The record also reflects the fact that Gordon had the power to determine rates of payment and that she maintained the personnel files of all employees at the Electrograph Hauppauge office. *Id.* at 55 (Gordon approved a raise given to Plaintiff); Decl. of Michael D. Palmer, Ex. H (Feb. 4, 2009, Decl. of Rose Ann Gordon) ¶ 3 ("As director of Human Resources I maintained the personnel files for all employees at the Hauppauge offices.").

Although the record is replete with questions of fact over the requested accommodations, the record could support a finding of liability under Section 296(6) as well. Plaintiff testified that in November 2005, she spoke to Gordon and requested that a railing be installed at the side entrance. *See* Scalera Dep. at 130-32, 148. It is Plaintiff's testimony that she first attempted to follow up by e-mail to Gordon regarding the requested hand rail, but the e-mail was never responded to. *Id.* at 130-31, 148. Scalera testified that she then called Gordon to discuss the request, but instead, was told to stop her office the next day to discuss it. *Id.* at 131, 148-49. Plaintiff recounts stopping by the next day, but Gordon was not there, and from that point forward, Gordon avoided her. *Id.* at 141, 149. According to Scalera, she again brought up the

request for a hand rail in March with Gordon, who did not respond. *Id.* at 149; Scalera Decl. ¶ 32.

In light of the apparent powers Gordon maintained, coupled with the disputed facts surrounding Gordon's conversations with the Plaintiff regarding the requested accommodations, the Court finds that summary judgment is not warranted.

### 2. *Koziol*

Defendants claim that Koziol, like Gordon, did not have the authority to do more than carry out routine personnel decisions. Although Plaintiff does not present as strong a case against Koziol as she did against Gordon, the Court finds enough support in the record to allow a jury to determine whether Koziol should be held individually liable.

Defendants claim that Koziol was not Plaintiff's manager, was not involved in the decision to hire or fire Plaintiff, and had no control over employees in other departments. The Court, however, fails to see the relevance of these contentions. The requirement for individual liability is whether the particular individual had the *ability* to do more than carry out personnel decisions, including the power to hire and fire employees and supervise and control employee conditions of employment, not that this individual actually used such powers with the plaintiff. That being said, the record provides little on the powers Koziol actually possessed.

Koziol served as the Director of Operations for Electrograph, which put her in charge of the warehouse, purchasing, reverse logistics as well as security and maintenance for the Electrograph facilities. *See* Koziol Dep. at 14-15. According to Koziol, the employees from these departments reported up to a manager, who reported to her. *Id.* at 14. While this testimony could support the argument that Koziol had the power to supervise and control certain

employee work schedules and conditions of employment, the record is bare with respect to the other elements of the economic realities test.

However, the record could support a finding of liability under Section 296(6). It is undisputed that Koziol was in charge of the maintenance of all Electrograph facilities. Defendant Smith testified that "[i]f there was going to be a change to the facility, it would have gone through [Koziol's] organization." *See* Decl. of Timothy P. Coon, Ex. D (hereafter referred to as "Smith Dep.") at 49. Plaintiff testified that in December 2005, she spoke with Koziol about the women's restroom and explained that she needed a higher toilet. Scalera Dep. at 110-12. According to Plaintiff, this conversation was followed up with another conversation about the need for higher toilets. *Id.* at 116-17. While these conversations are in dispute, the fact that higher toilets were not installed, is not. Therefore, if a jury credits Plaintiff's testimony and concludes that Koziol contributed to Electrograph's failure to make reasonable accommodations for Plaintiff, liability under Section 296(6) would attach. As such, Defendants' motion for summary judgment in favor of Defendant Koziol is denied.

### 3.   *Smith*

Defendants readily admit that Smith qualifies as an "employer" under the NYHRL since he was both an equity owner and had the necessary authority. Nevertheless, Defendants assert that there is no genuine issue of material fact regarding whether he discriminated against the Plaintiff since the only two times he was approached regarding Scalera's disability, he granted her the accommodations. Defendants further allege that Plaintiff has failed to identify any instance where she requested an accommodation directly from Smith.

The Court fails to see how this contention would altogether shield Smith from being individually liable under Section 296. At best, this argument would support a finding that Smith

would not be individually liable under Section 296(6), which requires actual participation in the conduct giving rise to the alleged discrimination. However, Defendants' assertions are irrelevant to an analysis under Section 296(1), which is a "direct liability" provision. *See Mugavero v. Arms Acres, Inc.*, No. 03 Civ. 5724, 2009 WL 890063, at *21 (S.D.N.Y. Mar. 31, 2009); *see also Bonner v. Guccione*, No. 94 Civ. 7735, 1997 WL 362311, at *15 (S.D.N.Y. July 1, 1997) (finding that individuals can be found personally liable under 296(1) "absent a finding of active participation"). If a jury ultimately concludes that Electrograph failed to provide a reasonable accommodation to the Plaintiff, because Smith had an ownership interest in Electrograph and had the power to do more than carry out personnel decisions made by others, he, too, can be found liable under Section 296(1). Therefore, Defendants' motion to dismiss Smith from this action is denied.

### D.     Remaining Arguments

As a last resort effort to have this case dismissed, Defendants claim that Scalera: (1) has unclean hands because she intentionally fell down the stairs since she was afraid of losing her job; and (2) abused the legal system. The Court finds that neither argument has merit.

The sole "evidence" to support Defendants' unclean hands argument is testimony from Plaintiff's supervisor, Paul Batterson. Batterson testified that Carolyn Reutter told him that Scalera told her that the Plaintiff intentionally planned to fall down the stairs. *See* Decl. of Michael D. Palmer, Ex. F ("Batterson Dep.") at 72-73, 77-78. Despite Defendants' attempts to show how this statement is admissible under various hearsay exceptions, the Court sees no combination of hearsay exceptions which would make this statement admissible under Rule 805 of the Federal Rules of Evidence. In addition, Scalera and Reutter categorically deny making

these alleged statements.  Reutter Decl. ¶¶ 32-33; Scalera Decl. ¶ 45.  Accordingly, there is no admissible evidence to support such an argument.[14]

Regarding the alleged abuse of the legal system, the fact that Plaintiff has "made frequent use of the judicial system" is of no legal consequence in the end.  Moreover, Defendants' contention that Plaintiff has already been compensated for her physical injuries by Workers' Compensation and should not be allowed to recover twice for the same injury under a different theory is misplaced.  "The New York State Worker's Compensation does not bar an employee from suing his employer under" the ADA.  *Liss v. Nassau Cnty.*, 425 F. Supp. 2d 335, 342 (E.D.N.Y. 2006); *see also Fowler v. Kohl's Dep't Stores, Inc.*, No. 07-CV-1197, 2009 WL 2155481, at *3 (N.D.N.Y. July 16, 2009) ("As to ADA claims, the Supremacy Clause of Article VI of the Constitution dictates that state Workers' Compensation statutes cannot preclude resort to federal discrimination statutes.").  In addition, this action involves damages stemming from Defendants' alleged failure to reasonably accommodate Plaintiff's disability, not just from injuries sustained when she fell.  While the Court has already addressed its concern over how those damages associated with Scalera's fall tie into this action, such a determination is not before the Court at this time.

---

14      Even had there been admissible evidence, Defendants' unclean hands argument would fail because such a defense cannot be asserted against claims involving money damages and the defense was not properly pled in the answer.  *See Herman v. Nat'l Enter. Sys., Inc.*, No. 07-CV-337S, 2008 WL 4186321, at *11 (W.D.N.Y. Sept. 10, 2008) (Report & Recommendation), *adopted in part and rejected on other grounds*, 2009 WL 1874197 (W.D.N.Y. June 29, 2009) (finding unclean hands affirmative defense "wholly irrelevant" to plaintiff's claims involving money damages); *United States v. N.Y. Metro. Transp. Auth.*, No. CV 2004-237, 2006 WL 708672, at *2 (E.D.N.Y. Jan. 12, 2006) (concluding that defendant waived defense of unclean hands since the affirmative defense was not pled in its answer); *Natcontainer Corp. v. Cont'l Can Co.*, 362 F. Supp. 1094, 1098 (S.D.N.Y. 1973) ("The interposition o, the defense of unclean hands against relief in the form of money damages is clearly improper.").

## V.    CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is DENIED in its entirety.  The parties are directed to participate in a telephone conference on April 27, 2012, at 4:00 p.m.   Plaintiff's counsel is directed to initiate the call to Chambers.


**SO ORDERED.**

Dated:  Central Islip, New York
        March 26, 2012

                                          /s/ A. Kathleen Tomlinson
                                          A. KATHLEEN TOMLINSON
                                          U.S. Magistrate Judge